IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-10248
_____


WILLIAM WESLEY CHAPPELL,

Petitioner-Appellant,


versus

JANIE COCKRELL, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
For the Northern District of Texas
(No. 4:00-CV-1663-A)
_____

April 29, 2002



Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM[*]:

A Texas jury convicted Petitioner-Appellant William Wesley Chappell of the capital murder of Alexandra Heath and recommended a death sentence. Chappell now seeks from this court a certificate

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

of appealability ("COA") to appeal from the district court's denial of habeas corpus relief. Because his claims lack merit under the requisite standards, we deny Chappell's request.

I.

FACTS AND PROCEEDINGS

The Court of Criminal Appeals described the evidence presented at Chappell's trial as follows:

> [Chappell] was charged with murdering Alexandra Heath in the course of committing or attempting to commit burglary of a building owned by her mother, Martha Lindsey, with the intent to (1) commit the felony offense of retaliation against Lindsey or her husband, Elbert Sitton, or (2) commit the theft of property belonging to Lindsey or Sitton. Heath, Lindsey, and Sitton were all killed inside Lindsey's home.
>
> The evidence illustrates that [Chappell] had a strained relationship with Lindsey, Sitton, and their daughter, Jane Sitton — Alexandra's half-sister. [Chappell], who was then 43 or 44 years old, and Jane, who was then 14 or 15 years old, began dating in 1981 or 1982 and stopped seeing each other in 1983 or 1984. In May 1984, [Chappell] was indicted for molesting Jane's daughter. Lindsey had reported the offense to the police. In May 1987, [Chappell] was found guilty of one count of indecency with a child and was sentenced to five years' confinement. [Chappell] was released on bond pending appeal.
>
> After the indecency trial, the Lindsey/Sitton family congregated outside the courtroom. When [Chappell] came out, he informed Lindsey that "it wasn't over yet" and that "he would get her for that." [Chappell] related this threat to his then-wife Sally Hayes, denied molesting Jane's daughter and said that Lindsey and the Sittons were after his money.[1] [Chappell] stated that he

---

[1] "Lindsey had filed a civil suit against him on behalf of Jane's daughter." Chappell v. State, No. 72,666, slip op. at 5 n.6 (Tex. Crim. App. Oct. 13, 1999) (unpublished) (en banc) (unanimous).

2

wanted to "do away" with the Lindsey/Sitton family.

In January 1988, Hayes drove [Chappell] to Lindsey's home, where Elbert and Jane also resided. [Chappell] had purchased some gasoline and put it in jugs. Hayes let [Chappell] out near Lindsey's home and drove around for fifteen minutes. When [Chappell] signaled her with his flashlight, she picked him up. [Chappell] no longer had all of the jugs and said that he had set fire to Lindsey's house. [Chappell] became upset when he later learned that the home suffered relatively little damage and that none of the occupants were injured.

In February 1988, [Chappell] and Hayes went to a gun show. Hayes testified that she purchased a 9-mm gun for [Chappell] and [Chappell] purchased some ammunition, an extra barrel, a spring, and a "small round thing with holes in it" that fit over the barrel of the gun. Thereafter, [Chappell] began working on a silencer for the gun. Hayes testified that [Chappell] tested this device at some property he had in Montague County. In March 1988, [Chappell] and Hayes purchased two walkie-talkies at a Radio Shack.

In April 1988, [Chappell] settled an unrelated personal-injury suit against a church and received a cashier's check for $66,000. That same month, [Chappell] and Hayes went to Hornbeak, Tennessee, where Hayes owned a house. [Chappell] brought $60,000 of his settlement to put into certificates of deposit in hopes of preventing the Lindsey/Sitton family from getting it. Hayes testified that [Chappell] planned to return to Texas and the Lindsey home in order to kill anyone who happened to be in it.

On May 3, 1988, [Chappell] and Hayes left Tennessee at 10:30 a.m. in a gray, burgundy, and black van. They arrived in Fort Worth around 8:30 p.m. and stopped at a grocery store on North Main Street. While Hayes went into the store, [Chappell] changed into dark clothing, makeup, and a wig. [Chappell] also had a black ski mask, brown gloves, and a nylon tote bag containing a walkie-talkie, the 9-mm gun, a pistol, the silencer, clips for the guns, a crowbar, and wire cutters.

Sometime after 9:00 p.m. Hayes let [Chappell] out of the van near Lindsey's home. Hayes then drove around the neighborhood waiting for [Chappell] to contact her by walkie-talkie. Fifteen to twenty minutes later,

3

[Chappell] contacted Hayes, and she picked him up. When he got into the van, [Chappell] stated that he had "shot Jane, her mother, and her daddy." He also said that he had taken some money to make it look like a robbery. The pair then drove back to Tennessee, where they disposed of as much evidence as possible. [Chappell] was shocked when he later learned that it was not Jane, but her half-sister, Alexandra Heath, whom he had killed.

Heath was shot several times while lying in bed and died at the scene. Before his death, Sitton told a Fort Worth police officer that an intruder wearing a ski mask had confronted Sitton and Lindsey in their bedroom, where they had been watching television. After Lindsey complied with the intruder's demand for money, the intruder shot the couple several times. Lindsey died two days later. Sitton, who survived for two months in the hospital, was able to tell the emergency room physician that he believed the intruder was the same man who raped his daughter or granddaughter.[2]

During the fourteen years since the occurrence of these events, the state has tried Chappell three times for the killing of Alexandra Heath; in two of the trials, juries found him guilty of capital murder and returned sentencing verdicts that require the death sentence. Chappell was first tried and sentenced for the murder in 1989. On direct appeal, however, the Texas Court of Criminal Appeals reversed the judgment and remanded for a retrial on the ground that the trial judge had erred by permitting the venire to be shuffled twice.[3] Chappell's second trial resulted in a mistrial after the court granted his supplemental motion for a

---

[2]Id. at 4-7. "Dr. Sirous Partovi, the emergency room doctor, could not remember whether Sitton said 'daughter' or 'granddaughter.'" Id. at 7 n.7.

[3]Chappell v. State, 850 S.W.2d 508, 511, 513 (Tex. Crim. App. 1993).

4

continuance. In 1996 Chappell's third trial ended as had the first: the jury convicted him of capital murder and, in the punishment phase, determined that his conduct was deliberate, that he would probably threaten society with future violent crimes, and that there were not enough mitigating circumstances to justify a life sentence as opposed to death. Given these determinations, Texas law required that the trial court sentence Chappell to death. This time, the Texas Court of Criminal Appeals affirmed.[4]

In 1999, while Chappell's state appeal was pending, he began habeas proceedings. Both the state district court and the Court of Criminal Appeals refused the requested writ.[5] The federal district court then denied Chappell's applications for a writ of habeas corpus[6] and a COA. Chappell timely applied to us for a COA. We have jurisdiction over his application under 28 U.S.C. §§ 1291 and 2253.[7]

II.

ANALYSIS

A.   Standard for Granting a COA

---

[4]See Chappell, No. 72,666, slip op. at 17.

[5]See Ex parte Chappell, No. 42,780-01 (Tex. Crim. App. Nov. 24, 1999) (unpublished) (en banc) (per curiam); Ex parte Chappell, C-2-4249-0365173-A (Tarrant Co. Crim. D. Ct. No. 2, Sept. 7, 1999).

[6]Chappell v Johnson, No. 4:00-CV-1663-A, 2001 U.S. Dist. LEXIS 1057, at *24 (N.D. Tex. Feb. 6, 2001).

[7]See also FED. R. APP. P. 22(b).

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")[8] provides that, for this court to review a district court's denial of habeas relief to a state prisoner, we must first issue a COA.[9] This, in turn, we cannot do unless a petitioner makes "a substantial showing of the denial of a constitutional right,"[10] which means that a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[11] This "reasonable jurists" standard is an objective one; it does not ask whether every single one of the Nation's jurists has reached or would reach the same conclusion.[12]

As we apply this standard in a capital case, "the nature of the penalty is a proper consideration . . . but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate."[13] This said, we generally resolve any

---

[8]Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Chappell applied for a federal writ on December 26, 2000.  AEDPA therefore governs his application.

[9]See 28 U.S.C. § 2253(c)(1)(A) (1994 & Supp. V 1999).

[10]28 U.S.C. § 2253(c)(2) (1994 & Supp. V 1999).

[11]Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (internal quotation marks and citations omitted) (citing Barefoot v. Estelle, 463 U.S. 893, 894 & n.4 (1998)).

[12]Williams v. Taylor, 529 U.S. 362, 410 (2000).

[13]Barefoot, 463 U.S. at 893; Slack, 529 U.S. at 483 ("Except for substituting the word 'constitutional' for the word

6

uncertainty about the propriety of granting a COA in the petitioner's favor.[14]  The petitioner's showing, however, cannot be merely conclusional, and must be supported by evidence in the record.[15]

Chappell's application requires that we note two further distinctions within this general standard of review.

### 1.  Merits versus Procedure

First, the Supreme Court counsels that if the district court rejects a petitioner's constitutional claims on the merits, then he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[16]  If the district court denies a habeas petition on procedural grounds, however, a COA should issue only if the petitioner "shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of a denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural

---

'federal,' § 2253 is a codification of the CPC standard announced in Barefoot.").

[14]Moore v. Johnson, 225 F.3d 495, 500-01 (5th Cir. 2000), cert. denied, 121 S. Ct. 1420 (March 26, 2001).

[15]Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983) ("[M]ere conclusory [sic] allegations do not raise a constitutional issue in a habeas proceeding.").

[16]Slack, 529 U.S. at 484.

7

ruling."[17]  In evaluating such a showing, we need not analyze the procedural issue first.  Rather, we may answer the constitutional question if that would hasten a fair disposition of the case,[18] even though the Ashwander constitutional-avoidance canon should "inform" our discretion in so doing.[19]

    2.    Facts versus Law

Second, if a state court adjudicated a state prisoner's claim for a writ of habeas corpus on the merits, federal courts view the petitioner's claim through the "lens" of the scheme laid out in 28 U.S.C. § 2254(d).[20]  Under this scheme, with respect to questions of fact, we are not to grant a writ of habeas corpus unless the state court's adjudication on the merits "resulted in a decision that was based on an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding."[21] And in any federal habeas proceeding involving a state prisoner, leaving aside the distinction between procedural and merits-based

---

[17]Id. (emphasis added).

[18]Id. at 485 ("Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments.").

[19]Id. (citing Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

[20]Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), cert. denied, 121 S. Ct. 902 (Feb. 7, 2001).

[21]28 U.S.C. § 2254(d)(2) (1994 & Supp. V 1999).

denials, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[22]

Likewise, if a state court has resolved on the merits an issue of law or a mixed issue of law and fact, we are not to grant a writ unless the resulting decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."[23] A decision is "contrary to" established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if the state court decides a case differently than the Supreme Court did on "materially indistinguishable" facts.[24] A state court "unreasonably applies" clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."[25]

---

[22]See 28 U.S.C. § 2254(e)(1) (1994 & Supp. V 1999).

[23]28 U.S.C. § 2254(d)(1) (1994 & Supp. V 1999).

[24]Williams, 529 U.S. at 405–06.

[25]Id. at 407–08. See also Neal v. Puckett, 2002 WL 407382, *3–4 (5th Cir.); id. at *13 ("In the absence of clear guidance from the Supreme Court, we conclude that our focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.").

With this statutory scheme firmly in mind, we examine the six issues on which Chappell seeks a COA from us.  He asserts that

(1) because the State based much of its case on the testimony of one accomplice-witness, the evidence did not sufficiently support Chappell's capital murder conviction;

(2) the evidence did not sufficiently support the jury's finding of future dangerousness;

(3) the trial judge unconstitutionally excluded hearsay evidence of another death row inmate's "admissions" to having murdered Heath;

(4) the trial court violated Chappell's right to a fair trial when it denied his challenge for cause of a prospective juror;

(5) the trial court violated Chappell's right to a fair trial in refusing to instruct the jury on the parole implications of a life sentence; and

(6) the State denied Chappell a meaningful appeal by not giving him timely access to the record, reasonable access to the prison law library, and adequate time to prepare his direct appeal.

We shall address each issue in turn.

B.    Sufficiency of the Evidence to Convict

Chappell first seeks a COA on his claim that the evidence against him was insufficient to convict him.  The district court held that this claim was procedurally barred and, alternatively,

10

that it failed on the merits.  We conclude that the procedural ruling would be debatable among reasonable jurists; but, as we shall show, the district court's merits holding would not.  We therefore deny a COA on this issue.

1. Procedure

In federal court, Chappell has clearly asserted that the evidence was constitutionally insufficient to support his capital murder conviction.  In state habeas proceedings, he framed this argument more narrowly, as a challenge to the evidence corroborating, and thus justifying the admission of, the testimony of his then-wife, a crucial accomplice-witness.  In making this argument, he clearly invoked both the United States and Texas Constitutions, as well as the State's accomplice-witness statute.  On direct state appeal, in which he appeared pro se, however, Chappell's argument was much more garbled.  The first two points of error in his state appellate brief essentially contend that the evidence did not support his conviction,[26] but his somewhat incoherent legal argument was largely couched in terms of the law of parties.  He mentioned insufficiency only twice,[27] although the second of these passages did plead insufficiency in the

---

[26]This portion of his appellate brief devoted eight pages to comparing the inculpatory and exculpatory evidence.

[27]He first stated that "Appellant submits, that it's questionable, if, the sufficiency of the evidence raised to a level of a party, to the offense."

11

alternative.[28]

A two-step procedural problem arises. First, the State urges that if Chappell had presented a broad insufficiency claim on state habeas, the state courts would have rejected it as procedurally barred.[29] Under Texas law, sufficiency claims not appealed are defaulted, and cannot be raised in state habeas proceedings.[30] To whatever extent Chappell failed to plead insufficiency on direct appeal, however, the state habeas courts did not apply the procedural bar. Rather, the habeas court adopted thirteen findings of fact and fourteen conclusions of law with respect to this claim, and the Court of Criminal Appeals agreed with the habeas court's reasoning.[31]

---

[28]"Appellant contends that if the error is to be considered 'trial error' then jeopardy's rule [sic] would bar retrial. However, if the error is considered insufficiency, the Texas Rules of Appellant [sic] Procedure, former Rule 81(c), new Rule 43.3(a), mandate[ ] an acquittal ordered in either scenario."

[29]Chappell, No. 72,666, slip op. at 2 ("[Chappell], appearing pro se, . . . does not raise a challenge to the sufficiency of the evidence.").

[30]Brown v. Collins, 937 F.2d 175, 178 (5th Cir. 1991); Clark v. Texas, 788 F.2d 309, 310 (5th Cir. 1986) ("Under Texas law, both the questions of the sufficiency of the evidence and of the propriety of a jury charge may be raised on direct appeal but not in a habeas proceeding.").

[31]Ex parte Chappell, No. 42,780-01 at 2. The substance of the order of the Court of Criminal Appeals reads as follows:

> [Chappell] presents six allegations challenging the validity of his conviction and resulting sentence. The trial court has entered findings of fact and conclusions of law recommending the relief sought be denied.
> This Court has reviewed the record. The trial court's

12

The problem encountered at the second step of this analysis is that, even assuming Chappell's claim would not have been procedurally barred, he cannot raise it here in precisely the same terms that he did in the state habeas proceedings. The accomplice-witness rule[32] of Texas, which requires the State to corroborate testimony of an accomplice-witness, is a creature of state criminal procedure and is not cognizable with respect to a federal habeas petition claim.[33] The district court therefore concluded, and the State argues on appeal, that Chappell cannot, in federal habeas proceedings, transmute the narrower claim that he did pellucidly raise in state habeas proceedings — his challenge to the sufficiency of corroborating evidence — into a broader challenge to the constitutional sufficiency of the evidence to convict.

We are not persuaded that Chappell never couched his state-court habeas claim in federal terms. Both state courts were certainly "alerted to the fact that the prisoner[ was] asserting

---

findings and conclusions are supported by the record and upon such basis the relief sought by the applicant is denied.

Id. Because this order refers to the trial court's findings and conclusions, it qualifies as an adjudication on the merits entitled to deference under the AEDPA. Trevino v. Johnson, 168 F.3d 173, 181 (5th Cir. 1999).

[32]See TEX. CODE CRIM. PRO. ART. 38:14.

[33]See Brown, 937 F.2d at 182 n.12 ("The [federal] Constitution imposes no requirement that the testimony of an accomplice witness be corroborated by independent evidence.").

13

claims under the United States Constitution,"[34] because the caption

of Chappell's first state habeas claim read as follows:

> The trial court violated [Chappell's] right to due process of law as guaranteed by Article I, Section 19 of the Texas Constitution and the Fifth and Fourteenth Amendments to the United States Constitution in denying applicant's motion for instructed verdict and in imposing sentence in this case because there was no corroboration of Ms. Hayes'[s] testimony . . . .[35]

Chappell thus "fairly presented to the state courts the substance

of his federal habeas corpus claim."[36]

Yet, even if Chappell did not plead his broader federal

constitutional claim in the state courts, our jurisprudence permits

us to take cognizance of his sufficiency-of-corroboration argument

as a federal sufficiency claim.[37]   Chappell therefore did exhaust

in the state courts the first claim he raises here.  And, although

a federal court may raise, even sua sponte, a state procedural bar

---

[34]Duncan v. Henry, 513 U.S. 364, 365–66 (1995) (per curiam).

[35]Chappell's Application for Post-Conviction Writ of Habeas Corpus (filed May 21, 1999) at 35.  Also, in describing his claim, Chappell contended that "the prosecution was so defective as to amount to a fundamental denial of due process as guaranteed him under Article I, Section 19 of the Texas Constitution and the Fifth and Fourteenth Amendments to the United States Constitution."  Id. at 42.

[36]Anderson v. Harless, 459 U.S. 4, 6 (1982) (internal quotation marks omitted).

[37]See Brown, 937 F.3d at 178–79 ("In our view, the instant challenge to the sufficiency of the evidence was subsumed within Brown's sufficiency claim [regarding corroboration of testimony by the accomplice-witness] on direct appeal.  This is not a case like Clark v. Texas, 788 F.2d at 310, in which the petitioner failed to raise a sufficiency challenge altogether.").

14

that the state habeas courts did not apply,[38] we find, on a close call, that whether Chappell raised this claim on direct appeal is debatable among reasonable jurists. We therefore pretermit procedural considerations and determine whether Chappell makes a substantial showing of a constitutional violation.[39]

2.  Merits

For us to issue a COA on the merits of Chappell's sufficiency claim, he must at least show that reasonable jurists could debate the district court's alternative merits denial.[40] This he has doubly failed to do.

a.  No Substantial Showing

First, the district court ruled that Chappell had failed to point to any specific defect in the evidence and that the conclusional allegations in his petition were insufficient to entitle him to habeas relief. We agree that Chappell's vague and conclusional allegations, standing alone, are plainly inadequate. His application to us, like his pleading in the district court, recites the legal standards, describes the district court's holding, and then merely states the following:

---

[38]Magouirk v. Phillips, 144 F.3d 348, 357–58 (5th Cir. 1998).

[39]We may deny a writ on the merits even if the petitioner's claim is unexhausted. See 28 U.S.C. § 2254(b)(2) (1994 & Supp. V 1999) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[40]Slack, 529 U.S. at 484.

15

> Petitioner-Appellant believes that whether the state sustained its burden to present sufficient evidence is debatable among jurists of reason and, further, a different court could resolve this issue in a different manner than the District Court did. Therefore, this issue meets the requirements of <u>Barefoot</u> and this Court should issue a Certificate of Appealability allowing the appeal of this issue to proceed.

Such an unsupported assertion falls well short of the substantial showing of the denial of a constitutional right that Chappell must make for us to grant a COA on his sufficiency claim.[41] We are satisfied that the district court could have denied collateral relief on this ground alone.

### b.   The Evidence Was Sufficient

Out of an abundance of caution, however, we have followed the district court's lead and carefully examined the record evidence in this case. And, like the district court, we conclude that the state habeas court's findings of fact and conclusions of law with respect to the accomplice-witness testimony firmly establish that Chappell has failed to make a substantial showing with respect to the sufficiency of the evidence to convict, likely because such a showing is simply not possible here. Chappell has no constitutional ground on which to base his insufficiency claim.

The standard of review in habeas proceedings of a claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of

---

[41]<u>See</u> <u>Ross</u>, 694 F.2d at 1011–12 (applying this principle pre-AEDPA).

16

fact could have found the essential elements of the crime beyond a reasonable doubt."[42]  If we were to apply this standard, we would make all reasonable inferences and credibility determinations in support of the verdict.[43]  Here, to secure a verdict, the State was required to prove, as essential elements, that Chappell (1) intentionally caused the death of Alexandra Heath (2) in the course of committing or attempting to commit burglary by entering a building without the effective consent of its owner and therein committing a felony — either theft or retaliation.[44]

As the state habeas court summarized in the following findings of fact, not only did the accomplice-witness give damning testimony against Chappell, but other evidence and witnesses corroborated her testimony, point by point.

>    2.   Sally Hayes, [Chappell's] wife and accomplice, testified that:
>    a.   On May 3, 1988, she and [Chappell] drove from Tennessee to Fort Worth in a gray, burgundy, and black Dodge van, arriving around 8:30 p.m.
>    b.   [Chappell] changed into black pants, a navy sweatshirt, a black jacket, black makeup, and black wig; he carried a black nylon tote bag with a walkie-talkie, 9mm gun, silencer, crowbar, and snippers inside, and a black ski mask.
>    c.   Sometime after 9:00 p.m., she let [Chappell] out of the van near the Lindsey-Sitton home

-----

[42]Jackson v. Virginia, 443 U.S. 307, 309 (1979) (emphasis original).

[43]Id.

[44]TEX. PENAL CODE ANN. §§ 19.02 (murder), 19.03 (capital murder), 30.02(a)(1) (burglary), 36.06(a)(1) (retaliation) (Vernon 1994).

17

and then drove around the neighborhood waiting for him to contact her by walkie-talkie.

    d.    About 15-20 minutes later, she received [Chappell's] call and went to 22nd Street to pick him up, where he told her that he "shot Jane, her mother and daddy."

[3].  After his conviction for indecency with a child, [Chappell] threatened Martha Lindsey that "it wasn't over yet" and that he "would get her for that." [testimony of Vickie Lynn Belt]

[4].  On March 23, 1988, [Chappell] purchased two walkie-talkies from Radio Shack.  [testimony of Scott Andrew Wetmore]

[5].  On May 2, 1988, [Chappell] told Lillie Cunningham that he was returning to Texas the next day.  [testimony of Lillie Summers Cunningham]

[6].  On May 3, 1988, a white man wearing a ski mask entered the home of Martha Lindsey and Elbert Sitton and fired several shots.  [testimony of Lieutenant Thomas Carl Swan, who related what the wounded Elbert Sitton told him in the hospital; Sitton also testified that the masked man demanded money, which Lindsey gave him]

[7].  After the shooting, Kevin Barrington, the victims' neighbor, saw a figure wearing all dark clothes. [testimony of Kevin Barrington]

[8].  About the same time, Mike Torres observed a white man walking down 22nd Street in all black clothes with a ski mask over his face. [testimony of Mike Torres]

[9].  Mr. Torres observed the man pull out a walkie-talkie, walk to the corner, and jump into a van. [testimony of Mr. Torres]

[10].  The bullets recovered from Alexandra Heath's body were a 9mm Luger caliber, as were two of the bullets recovered from Martha Lindsey's body. [testimony of Lieutenant Swan]

[11]. [Chappell] attempted to create an alibi for himself by falsely suggesting to several witnesses he was in their company in Tennessee on the night of this offense and early the following morning. [testimony of Claude Cranford, April Ann Glisson, and Penny Gail Oseman]

18

[12]. [Chappell] attempted to have his cellmate bonded out of jail in order to stage Ms. Hayes' [sic] suicide after leaving a note exonerating him and implicating his friend Ray Pruitt. [testimony of Christopher Patrick Carroll]

Chappell has not specifically contested any of these findings, much less presented clear and convincing evidence to refute any of them. The presumption of correctness therefore applies to them. These findings, viewed in the light most favorable to the verdict, amply support each essential element of capital murder. In claiming that the evidence was constitutionally insufficient to convict, Chappell does not — and cannot — make a substantial showing of the denial of a constitutional right.

C.   Sufficiency of the Evidence of Future Dangerousness

Chappell also contends that the evidence is insufficient to support the jury's affirmative finding that there was a probability that Chappell would in the future commit criminal acts of violence that would constitute a continuing threat to society. Texas law requires that a jury make this finding before the court may impose the death sentence.[45]

1.   No Substantial Showing

The district court rejected this claim because Chappell offered "nothing but conclusory [sic] allegations in support of this allegation." Chappell has offered nothing more in his application to us. Instead of explaining why the evidence does not

---

[45]TEX. CRIM. PROC. CODE ANN. 37.0711(b)(2) (Vernon 1981 & Supp. 2002).

19

support an affirmative answer to the special issue, Chappell merely states that "it is clear that the evidence at trial was constitutionally insufficient to support an affirmative answer to the 'future dangerousness' issue," and that "[n]o rational juror could have answered this special issue beyond a reasonable doubt[.]"  As we have already explained, such conclusional allegations do not justify the issuance of a COA.

2.  The Evidence Was Sufficient

Again, however, because this is a capital case, we have exercised caution and reviewed all the pertinent record evidence. Our review convinces us that Chappell can make no showing, much less a substantial one, that he has been denied any constitutional right with respect to the sufficiency of evidence supporting the jury's affirmative finding of future dangerousness.  If we were to review whether the evidence is sufficient to support the jury's finding of future dangerousness, we would again apply the standard stated above —— whether any rational trier of fact could answer the special issue affirmatively.[46]

The state court conducted a thoughtful and thorough analysis of the record evidence.  The court concluded from this analysis that "[t]he evidence shows that [Chappell], in an attempt to avoid responsibility for molesting a child, engaged in an escalating

---

[46]Miller v. Johnson, 200 F.3d 274, 286–88 (5th Cir. 2000) (applying the Jackson standard to a jury's "continuing threat" finding).

20

course of violence from threat to arson to the calculated murder of three people and then, in order to avoid responsibility for three murders, arranged for the murder of his wife-accomplice and the implication of a friend in these murders." The conclusion that this evidence, which Chappell's application does not contest, sufficiently supported the jury's finding of future dangerousness is not debatable among jurists of reason.

As Chappell has made no substantial showing of the denial of a constitutional right, we deny his request that we issue a COA on this claim.

D.   Exclusion of Hearsay "Admissions"

Chappell next complains of the trial court's refusal to permit him to present hearsay statements of Ricky Lee Green, another death row inmate, to show that Green, and not Chappell, murdered Heath and her parents. More specifically, Chappell argues that "[b]y excluding all testimony regarding [Green's] multiple admissions that he was the one who committed these murders, the trial court deprived [Chappell] of the right to present a defense and rendered his trial fundamentally unfair." We agree with the district court's determination that Chappell has failed to make a substantial showing that the exclusion of these hearsay statements amounted to the denial of a constitutional right.

We begin our analysis of this issue by briefly reciting the procedural history of Chappell's attempts to secure Green's live testimony at trial. The trial court held hearings in October 1993,

21

November 1993, and December 1995 on motions regarding allegations that Green had confessed to the murders. Green was not present at the first hearing. During the November 1993 hearing, which Green did attend, the trial court inquired into his competency and then admonished him about his rights and gave all statutory warnings. When the court then asked specifically whether Green wished to waive the attorney-client privilege and have communications allegedly made to his attorney, Danny Burns, disclosed, Green unequivocally answered "No." The court also asked: "Do you understand that by saying no now, you are basically saying all of those letters and things you have written, you didn't intend? Is that it?[,]" to which Green answered "Yes." Green also withdrew the waiver-of-privilege request wherein he told Burns to disclose any letter to Chappell's attorneys. The court then denied Chappell's attorney's request for the court to compel Burns to produce the previous letter, and refused the request to view any such letter in camera.

During the December hearing, before Chappell's retrial, Green invoked his Fifth Amendment right not to testify. When he first did so, Green was determined by the trial court to be competent and able to understand his right not to testify. Green then repeatedly asserted his right not to testify at Chappell's trial. Chappell, not surprisingly, still wished to offer the evidence through various out-of-court declarations allegedly made by Green. Chappell's counsel argued that even though these statements were

hearsay, they were nevertheless admissible as statements against penal interest. After conducting a hearing, the trial court refused to admit the statements, concluding that they did not satisfy the reliability requirement of the relevant state rule, which mandates that a statement against penal interest not be admitted "unless corroborating circumstances clearly indicate the trustworthiness of the statement."[47] Chappell has not directed our attention to any such corroborating circumstances.

The law is well settled that "[a] state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair."[48] Here, Chappell in effect complains that the trial court refused to allow unreliable hearsay evidence to be presented to the jury. But he has failed to show that, in so doing, the Texas court unreasonably applied federal law.

The Compulsory Process Clause of the Sixth Amendment gives a defendant the right to obtain favorable testimony from witnesses, and this right applies to the states through the Due Process clause of the Fourteenth Amendment.[49] "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts

---

[47]TEX. R. EVID. 804(24).

[48]Johnson v. Puckett, 176 F.3d 809, 820 (5th Cir. 1999).

[49]Washington v. Texas, 388 U.S. 14, 19 (1967).

23

as well as the prosecution's to the jury so that it may decide where the truth lies."[50]

Of the Supreme Court cases interpreting this right, the one that most closely parallels Chappell's claim, Chambers v. Mississippi,[51] stands at best[52] for the proposition that when a state court refuses to admit into a murder trial the confession of a third party to the crime for which the defendant is being prosecuted, such a refusal may violate due process if the confession bears "persuasive assurances of trustworthiness"[53] or "considerable assurance of [its] reliability."[54]

Green's "confession" bears no such assurances. In considering the propriety of its exclusion, under both federal and state law, the Texas Court of Criminal Appeals summarized the trial court's factual findings as follows:

> First, the trial court found that Green's confession did not coincide with the facts of the instant case. Testimony at the hearing showed that Green told defense investigator Tommy Brown that he killed "Inga" after they

---

[50]Id.

[51]Chambers v. Mississippi, 410 U.S. 284 (1973).

[52]We last discussed Chambers in detail in Little v. Johnson, 162 F.3d 855 (1998), where we stated that Chambers stands for a more limited proposition: that "certain egregious evidentiary errors may be redressed by the due process clause." Id. at 860 (quoting Barefoot, 697 F.2d at 593, and citing Maness v. Wainwright, 512 F.2d 88, 91 (5th Cir. 1975) as "recognizing factual limits" on the Chambers holding).

[53]Id. at 302.

[54]Id. at 300.

24

had been out drinking and then killed her parents. However, Heath was no longer going by the name "Inga," having changed her name to "Alexandra." Further, the autopsy results showed no alcohol present in Heath's system at the time of her death.

Second, the trial court found that Green's four known murders involved knives and a different type of motive and victim. Former Fort Worth Police Officer Danny LaRue investigated the capital murder for which Green was on death row. LaRue testified that in all of Green's confirmed murders, the weapon of choice was always a knife, the victims were always loners, and the murders had sexual overtones . . .

Third, the trial court held that Green's statements were not trustworthy, based on the following: (1) the amount of time and opportunity that [Chappell] and Green had together on death row to discuss the case; (2) Green had previously expressed a desire to take the blame for former death-row inmate John Yarborough's case; and (3) [Chappell] confessed to Yarborough about the instant crime.

. . .

The trial court found that death-row inmate David Wayne Stoker . . . had told defense counsel that Green killed the Sitton/Lindsey family over a drug deal——contrary to Green's confession. . . .

Lastly, defense investigator Edgar Loven testified that Green had confessed to Roger Thieleman while the two were being bused back to Tarrant County in February, 1992. The trial court found that the information was unreliable because Tarrant County booking records show that Green was not incarcerated in Tarrant County during that time period.[55]

These findings amply support the trial court's exclusion of Green's "confession."

In this court, rather than challenge these findings, which are therefore presumed to be correct, Chappell takes issue with the Court of Criminal Appeals's reliance on United States v. Scheffer,[56]

---

[55]Chappell v. State, No. 72,666, slip op. at 10–12.

[56]523 U.S. 303 (1998).

25

in which the United States Supreme Court upheld a per se exclusion of polygraph test results from military courts martial.[57]  In Scheffer, though, the Court made clear that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."[58]  Chappell's attempt to distinguish Scheffer on the ground that it is inapplicable to factual evidence tending to negate guilt rings hollow in light of the Supreme Court's emphatic repetition that "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.  The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly."[59]  In any event, this weapon certainly cannot be used to force the admission at trial of unreliable and unsubstantiated hearsay testimony.

The trial court gave Chappell a full and fair opportunity to substantiate the hearsay testimony that he wished to present to the jury.  That Chappell failed to do so with either convincing evidence or corroborating testimony bolsters our conclusion that the district court did not act unreasonably in rejecting this

---

[57]Id. at 306–07, 317.

[58]Id. at 308.

[59]See Taylor v. Illinois, 484 U.S. 400, 410 (1988) (holding that a trial court may constitutionally exclude the testimony of a material witness as a discovery sanction).

26

claim. Here, the state trial court did not err in excluding Green's hearsay statements, so neither the state courts nor the district court erred in denying habeas relief. As Chappell has failed to make a substantial showing that the exclusion of Green's uncorroborated hearsay statements violated his constitutional right to present a defense or rendered his trial fundamentally unfair, we decline to issue a COA on this claim as well.

E.   Denial of Challenge of Venireman for Cause

Chappell also contends that he was denied his right to a fair jury-selection process when the trial court denied his challenge for cause to the seating of a prospective juror, venireman Edward Brett Lea. Specifically, Chappell insists that Lea "was disqualified to sit on a capital murder jury and apply the law regarding mitigating circumstances" because Lea could not distinguish between whether Chappell's future dangerousness was a "possibility" or a "probability."[60] The district court concluded that these contentions are without merit; and since this conclusion is indisputable among jurists of reason, Chappell can make no substantial showing that would warrant the issuance of a COA.

Under the Sixth Amendment, a prospective juror may be excluded for cause if his views regarding the death penalty would "prevent

---

[60]The second special issue asked the jury "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. 37.0711(b)(2) (emphasis added) (Vernon 1981 & 2002 Supp.).

or substantially impair the performance of his duties as a juror in accordance with his or her oath."[61]  For example, a challenge for cause must be granted if a prospective juror states that he would automatically impose a death sentence without considering individual aggravating and mitigating circumstances.[62]  A potential juror may, however, be rehabilitated by counsel or the court; and if it becomes apparent that the juror could follow the law in accordance with his oath and the court's instructions, denial of a challenge for cause would be proper, and the challenged venireman could serve on the jury.  Moreover, a state trial court's "implicit finding of impartiality in its denial of the petitioner's challenge for cause" is a determination of fact, subject to a presumption of correctness on collateral review.[63]

To receive a COA on this claim, Chappell must make a substantial showing that jurists of reason would find the district court's disposition of this claim debatable or wrong.  The most concise analysis of his claim is that of the Court of Criminal Appeals, which conducted a painstaking review of the relevant testimony, and concluded that

> [t]he record shows that although at one point Lea characterized the terms ["possibility" and "probability"] as "synonymous" and "interchangeable," he later clarified

---

[61]Adams v. Texas, 448 U.S. 38, 45 (1980).

[62]See Morgan v. Illinois, 504 U.S. 719, 729 (1992).

[63]Montoya v. Scott, 65 F.3d 405, 419 n.29 (5th Cir. 1995); see also Fuller v. Johnson, 114 F.3d 491, 500–01 (5th Cir. 1997).

28

and retracted his characterization by stating that the terms were "not exactly interchangeable," noting that "probabilities" may be determined while "possibilities" are infinite. When a prospective juror's answers are vacillating, unclear, or contradictory, the trial judge's superior point of view is particularly important and deserving of our deference; and we will hold that the trial judge abused his discretion only if his decision is not supported by the record. . . . Having viewed Lea's voir dire as a whole, we hold that the trial judge did not abuse his discretion by denying the challenge for cause.[64]

Although he contends that the Court of Criminal Appeals effectively cherry-picked some of Lea's responses to justify the denial of the claim, Chappell points to none of Lea's responses that the court's alleged selectivity omitted. Instead, Chappell stacks inaccuracy on inaccuracy: He states that Lea never retreated from his initial statement that the terms "possibility" and "probability" are synonymous, and therefore, argues Chappell, "[s]ince admittedly all things are possible, a death sentence was assured."

Chappell has failed to show that the district court's determination was incorrect. The record shows that the trial court probed extensively into Lea's understanding of the words "probability" and "possibility." At no point did any of Lea's answers mandate the conclusion urged by Chappell — that Lea was predisposed to vote "yes" on this special issue, no matter what the evidence showed. Rather, Lea clearly said that whether the death penalty would be appropriate would depend on the evidence.

---

[64]See Chappell v. State, No. 72,666, slip op. at 16–17 (citations omitted).

Accordingly, we deny Chappell's request for a COA on this claim.

F.    Jury Instruction Regarding Parole

Chappell insists that he was denied a fair trial by the trial court's refusal to instruct the jury that if Chappell were sentenced to life imprisonment, he would not be eligible for parole within the remainder of the violent period of his life.[65] In Texas, however, parole eligibility is not a proper consideration for jurors during sentencing in capital cases.[66] The Texas Court of Criminal Appeals has held that the refusal to provide such an instruction does not violate the Texas Constitution.[67]

Chappell contends that under Simmons v. South Carolina,[68] due process requires that a parole instruction be given in his case. In Simmons, the United States Supreme Court held that due process

---

[65]Chappell committed his capital offense in May 1988. At that time, Texas law provided that a defendant convicted of capital murder who receives a life sentence is not eligible for parole until his actual time served equals fifteen years of confinement, without consideration of good-time credits. See former TEX. CODE CRIM. PROC. ANN. 42.12 § 3f(a)(1)(A) (Vernon 1979) and current § 3g(a)(1)(A) (Supp. 2002). In this case, Chappell would have been 68 years old before becoming entitled to be considered for parole. He does not refer us to any evidence regarding the degree of recidivism among 68-year-olds who have been released after serving lengthy sentences for murder.

[66]See Santellan v. State, 939 S.W.2d 155, 170 (Tex. Crim. App. 1997).

[67]See Smith v. State, 898 S.W.2d 838, 846–47 (Tex. Crim. App. 1995), cert. denied, 516 U.S. 843 (1995).

[68]512 U.S. 154 (1994).

30

requires the sentencing jury to be informed that the defendant is ineligible for parole when the defendant's future dangerousness is at issue and state law <u>absolutely prohibits</u> the defendant's release on parole.[69] In such a case, the defendant may obtain an instruction regarding that prohibition, to enable the jury to consider the impossibility of parole while it debates future dangerousness.

As the district court correctly observed, however, the <u>Simmons</u> plurality expressly distinguished Texas's sentencing scheme as not including a "life-without-parole sentencing alternative to capital punishment."[70] The plurality also stated that it would not "lightly second-guess a decision whether or not to inform a jury of information regarding parole" when parole is available.[71] We have repeatedly determined that <u>Simmons</u> does not apply to Texas capital cases: A Texas court's refusal to instruct the jury regarding parole passes federal constitutional muster.[72] Furthermore, our

---

[69]<u>Id.</u> at 168–69 (Brennan, J.) (plurality).

[70]<u>Id.</u> at 168 n.8.

[71]<u>Id.</u> at 168 n.8.

[72]<u>See</u> <u>Wheat v. Johnson</u>, 238 F.3d 357, 361 (5th Cir.) (collecting cases), <u>cert. denied</u>, 121 S.Ct. 2226 (2001):
> We have repeatedly recognized that the <u>Simmons</u> rule applies only when there is a life-without-possibility-of-parole alternative to the death penalty, an alternative that does not exist in Texas. To hold that a lengthy parole ineligibility is the <u>de facto</u> equivalent of a life sentence without possibility of parole, as [petitioner] argues, would create a new rule under the law of our Circuit.

jurisprudence in this area has recently received the support of Ramdass v. Angelone.[73]  In that case, the Supreme Court rejected a capital petitioner's contention under Simmons that a hypothetical future event, his "potential parole ineligibility," required that a parole ineligibility instruction be given to the sentencing jury.[74]

Reduced to its essence, then, this claim for relief asks that we announce a new rule of constitutional law regarding parole instructions and apply it to this case.  This we cannot do.[75]

Because the district court (and for that matter, the state

---

See also Hughes v. Johnson, 191 F.3d 607, 617 (5th Cir. 1999); Muniz v. Johnson, 132 F.3d 214, 224 (5th Cir. 1998); Allridge v. Scott, 41 F.3d 213, 222 (5th Cir. 1994) ("We therefore read Simmons to mean that due process requires the state to inform a sentencing jury about a defendant's parole ineligibility when, and only when, (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole.").  For state cases to the same effect, see Broxton v. State, 909 S.W.2d 912, 918–19 (Tex. Crim. App. 1995) (stating that Simmons is not applicable to Texas' capital sentencing scheme); Smith, 898 S.W.2d at 850 n.17 ("The underlying rationale for the Supreme Court in Simmons . . . is inapplicable to Texas jurisprudence.").

[73]530 U.S. 156 (2000).

[74]Id. at 167–68 (Kennedy, J.) (plurality); id. at 179–81 (O'Connor, J., concurring).  The rationale of the Ramdass dissenters does not apply here.  Compare id. at 182 (Stevens, J., dissenting).

[75]See Wheat, 238 F.3d at 361–62, where we stated that, given our numerous cases holding that the rule of Simmons does not apply to defendants who would be legally eligible for parole if sentenced to life in prison, to accept the argument that Chappell makes here would be to announce a new rule of constitutional law. Such an announcement is, of course, barred by Teague v. Lane, 489 U.S. 288, 310 (1989).

courts) applied current federal law not just reasonably but correctly, Chappell cannot make a substantial showing of the denial of a constitutional right. We therefore deny his application for a COA on this issue.[76]

G.   Denial of "Effective Right" to File a Pro Se Appellate Brief

Lastly, Chappell contends that he was denied the effective assistance of counsel and a fair appellate review of his sentence when the State "effectively prevented him from preparing his appellant's brief by refusing to allow him access to the record in a timely manner and refusing to allow [him] access to the [prison] law library to research his cases." More specifically, Chappell complains that he was denied (1) access to the trial record, (2) access to the prison law library, and (3) adequate time to write his brief on appeal. The district court ruled that this claim is procedurally barred, because it was never presented to the state courts and thus has not been exhausted. Again, as a cautious alternative, the district court went on to rule that Chappell's

_____

[76]Chappell directs us to Brown v. Texas, 522 U.S. 940 (1997), an opinion authored by Justice Stevens and joined by Justices Souter, Ginsburg, and Breyer, on a denial of a petition for writ of certiorari. That opinion remarked on "the need and desirability of giving a parole instruction when the period of parole is so long as to effectively keep a prisoner incarcerated for the remainder of the violent period of his life." Id. This portion of Brown, however, is of no precedential value, as Justice Stevens's opinion was a dissent from the denial of certiorari. Regardless of the merits of Justice Stevens's position, his dissent did not render the Texas habeas court's ruling on this issue an unreasonable application of federal law as interpreted by the Supreme Court.

claim is belied by the record and thus fails on the merits as well. Chappell has not made the showing required for a COA to issue with respect to either of these alternative holdings.

### 1.  Procedure

First, a review of Chappell's state writ petition plainly demonstrates that he never raised this claim in the state courts. Instead, Chappell argued that the Court of Criminal Appeals violated his right to counsel by "allowing [Chappell] to prepare and file his own direct appeal to his conviction in contravention to [sic] the Sixth and Fourteenth Amendments to the United States Constitution in that [Chappell] clearly lacked the professional competence necessary to effectively argue his own case."[77] Chappell raised no allegations that he was prevented from gaining access to the appellate record or to the prison law library. Neither does he mention the procedural bar in his COA application to this court, let alone attempt to explain how the district court incorrectly applied it. We hold that a COA cannot be granted on this unexhausted and thus procedurally barred claim.

### 2.  Merits

The district court alternatively ruled that Chappell's claim fails on the merits. He cannot make a substantial showing here, because the district court was entirely correct, as a brief review of the relevant events shows.

---

[77]Chappell does not repeat this argument to us.

34

After Chappell's court-appointed attorney filed a brief on direct appeal, Chappell filed motions to strike the brief, dismiss his counsel, and proceed pro se. The Court of Criminal Appeals remanded the case for a hearing on Chappell's motion for self-representation.

At the hearing, the trial court admonished Chappell about the dangers and disadvantages of self-representation. For example, the trial court warned Chappell that "any other appellate lawyer[ ] would have greater access to research materials than anyone that is incarcerated," and that Chappell faced "many limitations" in accessing "various documents and materials." Chappell answered, "Yes, sir, I realize that. It's a definite handicap." Chappell nevertheless insisted on exercising his state right to self-representation on direct appeal in conscious disregard of the trial court's repeated warnings about proceeding pro se, particularly in light of the seriousness of the punishment he was facing. The Court of Criminal Appeals subsequently granted Chappell's motion for self-representation, relieved Chappell's appointed counsel of any further duties, and ordered that the brief previously filed be removed from the record.

Our review of the record convinces us that the State did not prevent Chappell from preparing his appellate brief in a timely fashion. Chappell may not have received the record as promptly as he would have liked, but he was granted two extensions of time in which to prepare his brief. Chappell does not argue that the delay

35

in receiving the record prevented him from raising any claims on his direct appeal or harmed his defense in any other way; he ultimately filed a 96-page brief incorporating the points made by his former counsel and raising a total of seven points of error. None of Chappell's appellate filings were in fact rejected as untimely.  On this point, Chappell thus has made no substantial showing — and cannot.

Similarly, Chappell has not shown that he was denied adequate access to the prison law library to prepare his appellate brief. Chappell himself testified at the hearing that he had adequate access to the law library through his fellow inmates: "To get around this rule [a limit on the number of sources a prisoner could request at one time], you get other people to order three law books also . . . .  I can get as many as I need because I can get five people, ten people, whatever I need, to order me three law books each."  Having insisted on proceeding pro se despite the trial court's lucid and fully adequate warnings about the potential risks and hardships of self-representation, Chappell cannot now be heard to complain of those same risks and hardships, or the untoward results, if any, that they may have produced, as grounds for habeas relief.

Chappell summarizes this claim by urging that "the State cannot constitutionally deprive the petitioner of the tools to complete a successful brief of all the issues he should have been given," and that petitioners have a right to effective assistance

on direct appeal.  But, inasmuch as broad generalities never suffice as a substantial showing of the denial of a constitutional right, and because we find the district court's determinations with respect to the record, the library, and the appellate scheduling to be beyond debate among reasonable jurists, we hold that a COA should not issue on this ground either.

III.

CONCLUSION

For all the foregoing reasons, Chappell's application is DENIED.